UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

KAREN DUNPHY,

        Plaintiff,

v.                                                 Case No.  5:06-cv-8-Oc-GRJ

MICHAEL J. ASTRUE[1], Commissioner of
Social Security,
        Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 3) and both parties have filed briefs outlining their respective positions.  (Docs. 8 & 9.)  For the reasons discussed below, the Commissioner's decision is due to be **REVERSED and REMANDED.**

## I. PROCEDURAL HISTORY

On January 9, 2003, Plaintiff filed an application for a period of disability and disability insurance benefits claiming a disability onset date of June 15, 2000. (R. 66.) Plaintiff's application was denied initially (R. 49-50), and upon reconsideration. (R. 46-47.)  Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

("ALJ"). The ALJ conducted Plaintiff's administrative hearing on January 4, 2005 (R. 313-325) and issued a decision unfavorable to Plaintiff on April 29, 2005. (R. 23-34.) The Appeals Council denied Plaintiff's request for review on December 2, 2005. (R. 4-6.) On January 10, 2006, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[6]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

---

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker at 1003.

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. **SUMMARY OF THE EVIDENCE**

Plaintiff was born on December 3, 1946 and was fifty-eight (58) years old at the time of the decision. (R. 315.) Plaintiff completed high school and has a bachelor degree in education. (R. 315.) Plaintiff has past relevant work history as an elementary school teacher, a house cleaner, a cashier and a writer. (R. 316.)  Plaintiff contends that she became disabled on June 15, 2000 due to interstitial cystitis, migraines, carpal tunnel syndrome, allergies, pain in the neck, back, arms and hips, and depression. (R. 316-319.)

Based upon the evidence submitted and the testimony presented at the hearing, the ALJ determined that Plaintiff suffers from bilateral carpal tunnel syndrome, a history of interstitial cystitis ("IC") and osteopenia. (R. 33.) The ALJ determined that Plaintiff was incapable of performing her past relevant work but that she retained the residual functional capacity (RFC) to perform a full range of light work. (R. 34.)

---

[20] Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

Plaintiff claims that IC is her worst condition because she has to use the restroom every 20-25 minutes. Plaintiff's treatment for urinary problems began in 1994 when she sought treatment from Peter Carey, M.D., a urologist. Dr. Carey treated Plaintiff from March 11, 1994 through February 10, 1999 for chronic urinary symptoms including frequent urination up to 22-23 times daily, pelvic pain and pressure, vaginosis, right flank and back pains, headache, palpitations and cutaneous flushings. At Plaintiff's March 11, 1994 visit with Dr. Carey, Plaintiff was found to have mild uterine enlargement, but her bladder and urethra were normal on bi-manual examination and Plaintiff's urinalysis showed normal sediment. Dr. Carey did note that Plaintiff had significant ptosis of the right kidney. Dr. Carey prescribed Plaintiff pain medication at this visit. (R. 130-131.)

On August 31, 1994, Plaintiff saw Dr. Carey with complaints of "severe bladder pressure, frequency and urgency, day and night." Dr. Carey noted that Plaintiff "is thought to have an elevated residual urine on August 15, 1994 and she was put on a brief course of Urecholine." Plaintiff reported no further kidney pain, but that she experienced steady pelvic pressure. Dr. Carey found that Plaintiff's bladder and urethra were normal, but that her uterus was moderately enlarged and anteverted onto the top of the bladder. Dr. Carey's impression was that he did not think Plaintiff had an atypical urinary tract infection. Plaintiff was prescribed Urised, Doxycycline and Flagyl. (R. 128.)

Plaintiff returned to Dr. Carey's office on December 30, 1998 with complaints of constant pelvic pressure, urge to void, increased frequency and nocturia, and also intense pain in the introitus. Dr. Carey noted that Plaintiff's bladder and urethra were normal but that there was a large uterine fibroid, pressing anteriorly onto the posterior

bladder wall. It was noted to be the size of a lemon. Dr. Carey's impression was that he was "not sure if her pelvic and bladder pains are due to a flare of chronic bladder condition, such as interstitial cystitis, or if they are related to the sizeable uterine fibroid which is partially filling up the low pelvis." Plaintiff was instructed to keep a voiding diary and was prescribed Detrol and Benadryl. (R. 127.)

On February 10, 1999, Plaintiff returned to Dr. Carey's office with her voiding diary, which showed that she voided 22-23 times in a 24 hour period. Dr. Carey noted that her urine culture was negative and her urinalysis was normal. Plaintiff was put on a regimen of Detrol and Benadryl. Plaintiff reported that she showed a marked improvement and was now only voiding 13 times per day. Dr. Carey noted this was a "significant improvement" and that she "often can sleep through the night without arising to void." (R. 126.)

Plaintiff visited the Mary Washington Hospital Emergency Department on April 4, 1999 with complaints of acute abdominal pain and was prescribed Demerol. (R. 134-135.) Plaintiff was then examined by Dr. John Bonaface, a gastroenterologist, for abdominal pain and abnormal liver function tests from April 22, 1999 through May 6, 1999. Dr. Bonaface concluded that the pain was an adverse reaction to erythromycin, intercurrent viral infection and reactive depression. (R. 142-144.)

Plaintiff was treated by Dr. Robert DeBlasi, an orthopaedist, for left hip pain. He diagnosed plaintiff with trochanteric bursitis and prescribed multiple injections of corticosteroids with Xylocane and referred Plaintiff to physical therapy. (R. 149-150.) Plaintiff received physical therapy on her left hip until July 10, 2000. (R. 151-152.) On

7

March 15, 2000, Plaintiff saw Dr. DeBlasi and reported that her left hip was getting better, but there was still some residual tenderness remaining.

Plaintiff was also treated by Dr. John D. Anderson, a gastroenterologist, who performed a colonoscopy for rectal bleeding. Plaintiff was diagnosed with occasional small diverticula, but there was no evidence of inflammation or bleeding. Plaintiff was also diagnosed with moderate size internal hemorrhoids. (R. 153.154.)

Beginning on March 6, 2001, Plaintiff began treatment with Chris W. McKenney, a chiropractor, for recurrent neck and back pain. Plaintiff sought treatment with Dr. McKenney until December 17, 2002. Dr. McKenney's progress notes disclose that Plaintiff had cervical and lumbar pain with accompanying disc degeneration. Plaintiff was treated with manipulations and heat/cold packs. (R. 177-183.)

Plaintiff was examined by Dr. Jay Rubin, a neurologist on February 6, 2003. Dr. Rubin's notes disclose that Plaintiff has a history consistent with chronic bilateral carpal tunnel syndrome, but that it was not previously documented by any diagnostic studies. Plaintiff suffered from chronic neck pain mostly localized in the lower cervical region and chronic law back pain that is likely associated with degenerative arthritis. Dr. Rubin also noted that Plaintiff suffers from trochanteric bursitis and a mild right pyriformis muscle spasm, and has a history of migraine headaches occurring once a month, for which she takes Zomig. Dr. Rubin's medical history also discloses that Plaintiff has a history of post traumatic stress disorder associated with being physically and emotionally abused by her first husband and with her son's death from a cerebral hemorrhage during that period. Dr. Rubin concluded that he thought "her history of very significant stresses are likely contributing to a chronic pain disorder associated with musculoskeletal symptoms,

and some somatization" and that he believed "her symptoms are genuine and that emotional factors have probably made some of her symptoms more pronounced." (R. 187.)

Dr. Rubin performed a neurological exam of the Plaintiff. The exam did "not reveal features of significant weakness, sensory impairment, gait impairment or other problems that typically need to be documented in social security disability application (neurologically)." Dr. Rubin did not that "she my be disabled due to psychiatric disease, rheumatological disease and possibly her history of urological disease." (R. 187.) A progress note, dated February 17, 2004, from Dr. Rubin states that nerve conduction studies documented "moderate and chronic bilateral carpal tunnel syndrom probably slightly more chronic on the right than the left." Dr. Rubin stated that carpal tunnel release surgery is warranted and could be considered inevitable. (R. 184.)

Plaintiff was also treated around this same period of time by Dr. Marivic Villa for shortness of breath. On February 18, 2003 Dr. Villa diagnosed Plaintiff with chronic sinusitis, asthma, arthritis, interstitial cystitis, menopausal disorder, osteopenia and a urinary tract infection. Plaintiff was treated with Allegra and a hormonal replacement. (R. 189-199.)

On March 18, 2003, a physical RFC capacity assessment was completed by Alan G. Tetlow, M.D., an anesthesiologist. Dr. Tetlow diagnosed Plaintiff with degenerative cervical and lumbar disc disease, transient bursitis and interstitial cystitis. Dr. Tetlow found Plaintiff capable of performing light work, but was limited in arm pushing/pulling and could only occasionally engage in climbing, stooping, keeling,

crouching and crawling. Plaintiff was to avoid concentrated exposure to fumes, odors and hazards. (R. 203-210.)

On March 17, 2003, Plaintiff was seen by Thomas E. Lafferty, M.D., an orthopaedist, at the request of Dr. Rubin. Dr. Lafferty opined that Plaintiff suffered from degenerative disc disease in the cervical and lumbar spines with possible radiculopathy, especially in the neck given her history of dysesthesias in the arms, moderate and chronic carpal tunnel syndrome, and muscle spasms which could be contributing to her nocturnal pain. Dr. Lafferty stated that "with her interstitial cystitis that teaching would be difficult, if not impossible, to carry out. However, I would recommend a functional capacity evaluation prior to making a disability determination." (R. 211-214.)

An MRI of Plaintiff's cervical spine was obtained by Manoj Bhatia, M.D. on March 28, 2003. Dr. Bhatia found that Plaintiff had moderately severe to severe degenerative disc disease at C5-6, causing mild spinal and bilateral neural foraminal stenosis. (R. 216.)

On April 22, 2003, Plaintiff received a mental evaluation by Rodney Poetter, PhD, for a disability determination.  Dr. Poetter opined that Plaintiff's symptoms "are suggestive of Panic Disorder without Agoraphobia." (R. 219-221.)

Val J. Bee, a nonexamining State agency physician, completed a Psychiatric Review Technique form (PRTF) on May 8, 2003. Dr. Bee noted that Plaintiff had anxiety with panic disorder in partial remission. Dr. Bee assessed mild limitations in daily living activities, social functioning and maintaining concentration, persistence or pace. Similar PRTF findings were noted the following month. (R. 222-236, 261.)

On June 12, 2003, Donald Warren Morford, M.D., a nonexamining State agency physician completed a physical RFC assessment form. Dr. Morford deemed Plaintiff capable of performing "light" work; however, she was to avoid repetitive use of her arms and can only occasionally climb, balance, stoop, kneel, crouch and crawl. Fingering and reaching in all directions can occur only "occasionally." In addition, concentrated exposure to hazards, such as machinery and heights should also be avoided. (R. 243-250.)

Plaintiff also sought treatment from Anis Shahmiri, M.D. on October 10, 2003, at which time Plaintiff complained of constant back pain, more severe on her left side. He noted that Plaintiff had been to the emergency department a week prior for a urinary tract infection. Plaintiff was provided Tequin and the symptoms were noted to have persisted. Dr. Shahmiri noted that Plaintiff's urinalysis is "unremarkable." Dr. Shahmiri's notes also disclose that Plaintiff mentioned that she had been in Australia two months prior to the visit and had similar pains which lasted about two weeks.

Plaintiff returned to Dr. Shahmiri on December 5, 2003 at which time she reported that her abdominal pain had subsided but that she was having respiratory symptoms for the past five days. Plaintiff mentioned that she was planning a trip to Thailand. On her return visit to Dr. Shahmiri on March 16, 2004, Plaintiff denied any current stress, headache, visual complaints, chest pain, shortness of breath and palpitations. Plaintiff stated that while she did feel tired at times, she exercised regularly at Curves Fitness Center. She recently had a urinary tract infection, which had resolved with Ciprofloxacin. Plaintiff did report chronic urinary symptoms with pressure and

frequency. Dr. Shahmiri noted that Plaintiff has a history of interstitial cystitis, but that her symptoms were stable at that time. (R. 288-289.)

At Plaintiff's June 8, 2004 visit with Dr. Shahmiri, Plaintiff appeared "in good health." At that time, Plaintiff's urinalysis was normal and she was asymptomatic. Plaintiff's blood pressure was well controlled and her total cholesterol was down. (R. 291-292.)

On October 29, 2004, Dr. Shahmiri completed a "Physical Capacities Evaluation" form. Dr. Shahmiri opined that Plaintiff could occasionally lift up to 5 pounds and sometimes lift 6-10 pounds. Plaintiff could carry up to 5 pounds. However, Dr. Shahmiri indicated that lifting or carrying would exacerbate or aggravate Plaintiff's problems. Plaintiff could sometimes push or pull while seated or standing, and could sometimes reach above shoulder level. However, Plaintiff Dr. Shahmiri noted that Plaintiff can never bend, squat, crawl or climb. Dr. Shahmiri concluded that Plaintiff could sit for up to 2 hours of an 8 hour workday, stand for 1 hour, could walk for up to 2 hours, and could alternate sitting with standing for up to 4 hours. Plaintiff can also do repetitive movements with the lower extremities.

Dr. Shahmiri found that Plaintiff has mild restrictions from unprotected heights, moderate restrictions from changes in temperature, but that she can never be exposed to dust, fumes or gases and can drive automotive equipment "short distances." Dr. Shahmiri concluded that Plaintiff suffers from chronic moderate pain and that her pain would affect her ability to concentrate in a work-like setting. However, Dr. Shahmiri found that Plaintiff has no altered gait or need for an assistive device for ambulation. According to Dr. Shahmiri, Plaintiff suffers from aching and soreness and it would be

necessary for Plaintiff to take frequent rest periods after walking short distances due to "achiness, fatigue."

Dr. Shahmiri found that Plaintiff is not capable of sustaining a reasonable walking pace and that this would interfere with her activities of daily living. Dr. Shahmiri stated that while Plaintiff could walk more than one block at a reasonable pace on uneven surfaces, she "would experience extreme amount of pain afterwards, particularly in neck and hip." Dr. Shahmiri found that Plaintiff is not capable of independently carrying out routine ambulatory activities, such as shopping, banking, climbing stairs without the use of an assistive device. Dr. Shahmiri stated that Plaintiff needs "personal assistance for lifting and reaching, and frequent rest stops." Dr. Shahmiri noted that Plaintiff has been severely limited in her ability to perform even a minimal amount of work activity since at least June 15, 2000. (R. 304-310.)

## IV.  DISCUSSION

### A.  The ALJ Ignored Plaintiff's Interstitial Cystitis When Assessing Her RFC and Credibility.

Plaintiff first argues that the ALJ "made no assessment of the symptoms of IC and focused upon Dr. Shahmiri's statement in June, 2004 that 'her urinary problems were asymptomatic.'"[23] According to Plaintiff, the ALJ "did not consider that Plaintiff's symptoms may vary over time...or that her symptoms were clearly present at the time of her testimony in January, 2005." As a result, the Plaintiff concludes that the ALJ erred by "dismissing Plaintiff's diagnosed IC and failing to assess the effects of IC upon Mrs.

---

[23] Doc. 8.

Dunphy's 'ability to perform routine movement and necessary physical activity within the work environment,'" in accordance with SSR 02-2p.[24]

SSR 02-2p defines IC as "a complex, chronic, bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain." The symptoms of IC "may vary in incidence, duration, and severity." In addition, symptoms "vary both in kind and in intensity from individual to individual, and even in the same individual."[25]

Although the ALJ classified Plaintiff's IC as a severe impairment, the ALJ failed to make any assessment of the functional limitations of the symptoms of Plaintiff's IC and instead focused on one comment in Dr. Shahmiri's progress note from June, 2004 in which Dr. Shahmiri reported that Plaintiff's "urinary problems were asymptomatic."[26]

According to SSR 96-7p, "the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible." The ALJ must take into consideration that symptoms may vary in their "intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence or functional effects of his or her symptoms."[27]

While the ALJ mentions Plaintiff's IC in general several times in his decision, the ALJ completely failed to discuss and ignored the effects of Plaintiff's IC, and failed to

---

[24] Id.

[25] SSR 02-2p. (2002).

[26] R. 31.

[27] SSR 93-7p (1996).

14

address how the IC affected Plaintiff's functional limitations, particularly in view of the fact that IC symptoms may vary over time. The ALJ simply dismissed Plaintiff's IC based on the isolated comment at the June 2004 appointment that Plaintiff's "urinalysis was normal and [at that time] she was asymptomatic."[28]

In assessing IC, the ALJ "must consider all of the individual's symptoms in deciding how such symptoms may affect functional capacities."[29] The effects of IC may not be obvious and may affect the ability to "focus and sustain attention," may "disrupt sleeping patterns," and can "necessitate trips to the bathroom as often as every 10 to 15 minutes, day and night."[30]

A review of the ALJ's decision and the medical evidence discloses that the ALJ failed to consider how the symptoms from IC impacted Plaintiff's functional capacities and he ignored the medical evidence relating to Plaintiff's IC. For example, the record discloses that Plaintiff reported voiding up to 22 times a day. Further, the medical evidence discloses that Plaintiff's symptoms from IC continued over the span of several years and varied in intensity over time. Indeed, Plaintiff's symptoms from IC were severe enough to lead Dr. Lafferty, one of Plaintiff's treating physicians, to conclude that "as for a disability status ...her [Plaintiff's] interstitial cystitis would make it difficult to teach."[31] Lastly, the record discloses that Plaintiff had visited the emergency room with

---

[28] R. 29.

[29] SSR 02-2p.

[30] Id.

[31] R. 28.

a urinary tract infection and notably, at the hearing, Plaintiff testified that she continues frequently to void, which causes disruption at church and at the movie theater.[32]

Notwithstanding this evidence relating to the symptoms from IC - including Plaintiff's own testimony that she continues to void frequently (at times up to 22 times a day) - the ALJ failed to discuss and assess whether these symptoms would functionally limit, if at all, Plaintiff's ability to perform routine movement and required physical activity within the work environment. Because the ALJ failed to discuss in any meaningful way Plaintiff's IC symptoms and failed to address whether such symptoms would functionally limit Plaintiff's ability to perform work at the light exertional level, the matter is due to be reversed and remanded to the Commissioner for further evaluation of this issue.

### B. The ALJ Improperly Rejected The Opinion of A Treating Physician.

Plaintiff also argues that the ALJ erred by ignoring and rejecting Dr. Shahmiri's functional assessment and disability opinion, while accepting the opinions of nonexamining physicians.

Dr. Shahmiri provided a "Physical Capacities Evaluation,"[33] in which he responded to a series of questions concerning Plaintiff's physical restrictions as well as her alleged pain. Dr. Shahmiri indicated on the form that Plaintiff could not alternate sitting or standing for more than 4 hours at a time and that Plaintiff has pain that would affect her ability to concentrate in a work-like setting. However, without any explanation

---

[32] R. 324-325.

[33] R. 304-310.

or discussion of the progress notes - or even providing a clue of the progress notes relied upon - the ALJ summarily concluded that this assessment was inconsistent with Dr. Shahmiri's own progress notes and was inconsistent with the objective medical evidence as a whole.

While the ALJ did articulate in a general sense that he did not follow Dr. Shahmiri's opinion because of the inconsistency between the assessment and Dr. Shahmiri's own notes, the ALJ failed to discuss or provide any guidance concerning how the opinion was inconsistent with Dr. Shahmiri's progress notes - other than the passing mention of the June 2004 progress note that Plaintiff was asymptomatic.[34] Although, the ALJ was not required to discuss every page of Dr. Shahmiri's progress notes, merely referencing one progress note from one examination - that the urinary problems were asymptomatic - standing alone is insufficient and certainly not substantial evidence to support the ALJ's decision to reject Dr. Shahmiri's opinion because it was inconsistent with his progress notes.

The ALJ also rejected Dr. Shahmiri's opinion because he concluded it was inconsistent with the medical evidence as a whole. Again without any explanation or detail the ALJ failed to identity the inconsistent medical evidence relied upon to support his conclusion to reject Dr. Shahmiri's opinion. Indeed, an examination of the medical evidence of record discloses that the medical evidence as a whole was not inconsistent with Dr. Shahmiri's opinion. For example, the medical records from the other two treating physicians - Dr. Lafferty and Dr. Rubin - are not inconsistent with Dr. Shahmiri's

---

[34] Id.

assessment but rather concern medical issues that are not inconsistent with Dr. Shahmiri's opinions and include additional medical findings that are supportive of Dr. Shahmiri's conclusions.

For example, while the ALJ noted that Drs. Rubin and Lafferty found that Plaintiff showed normal gait and minimal decreased range of motion of the cervical spine, as well as intact sensory findings, the ALJ ignored the fact that Dr. Rubin diagnosed Plaintiff with CT, neck and back pain associated with degenerative arthritis, right trochanteric bursitis, PTSD and a chronic pain disorder. In addition, Dr. Rubin opined that Plaintiff has sufficient limitations that Plaintiff may be disabled due to psychiatric disease, rheumatological disease and possibly due to Plaintiff's history of urological disease.[35]

Moreover, the "objective medical evidence as a whole," which the ALJ concluded was inconsistent with Dr. Shahmiri's opinion, includes an MRI of the cervical spine in March 2003, which revealed moderately severe to severe DDD at C5-6, causing spinal bilateral neural stenosis.[36] Lastly, Dr. Lafferty's medical records disclose that he diagnosed Plaintiff with carpal tunnel syndrome and recommended surgery. Dr. Lafferty found possible radiculopathy from the DDD, as well as osteopenia in the lumbar spine and femoral neck and tenderness in several areas.[37]

The ALJ ignored this evidence and rather than giving appropriate weight to the opinion of Dr. Shahmiri, a treating physician, the ALJ discounted Dr. Shahmiri's opinion

---

[35] R. 187.

[36] R. 216.

[37] R. 213-214.

without articulating adequate reasons for doing so which are supported by substantial evidence. Instead, the ALJ improperly found the opinions of the non-examining state agency physicians most persuasive stating that their opinions were " supported by the objective medical evidence and other reports,"[38] again without explaining how these opinions were supported by the medical evidence and the other reports. While the opinion of a non-examining state agency doctor is evidence it is well-settled that the opinions of non-examining doctors are "entitled to little weight and taken alone do not constitute substantial evidence to support an administrative decision."[39] Accordingly, the ALJ improperly rejected the opinion of Dr. Shahmiri, Plaintiff's treating physician.

Lastly, in making his RFC assessment of Plaintiff, the ALJ erred with regard to his assessment of Plaintiff's manipulative deficits. In concluding that "there is no indication of significant gross or fine manipulative deficits" the ALJ improperly relied upon evidence that was either not of record - or even if it was - is not the type of information which constitutes substantial evidence. As support for his assessment of Plaintiff's manipulative limitations, the ALJ improperly relied upon the fact that the reports submitted to the Commissioner were purportedly manually prepared by Plaintiff. The ALJ stated that "she either handwrote or typed many pages describing her illness indicating no significant deficits with her upper extremities."[40] There is, however, nothing in the record documenting who actually filled out the Social Security forms - or even assuming Plaintiff did fill them out - there is nothing in the record to document how Plaintiff filled out the forms or how long it took her to do so. Thus, this finding by the

---

[38] Id.

[39] See Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir. 1990).

[40] R. 31.

ALJ at best is not supported by any substantial evidence and at worst is an improper attempt by the ALJ to use his personal observation as a surrogate for a medical opinion.

Accordingly, for all of these reasons, the Court concludes that the ALJ failed to articulate adequate reasons supported by substantial evidence for failing to give appropriate weight to the assessment by Dr. Shahmiri. Therefore, independent of the ALJ's failure properly to evaluate the functional limitations of Plaintiff's IC, the matter is due to be reversed and remanded for the ALJ to properly assess, discuss and evaluate the opinion of Dr. Shahmiri, Plaintiff's treating physician.

## V. CONCLUSION

For the reasons discussed above, the decision of the Commissioner is due to be **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) for the ALJ to: (1) perform a new RFC assessment which addresses and discusses the Plaintiff's functional limitations, if any, from Plaintiff's IC, (2) accord appropriate weight to the opinion of Dr. Shahmiri, as a treating physician, and (3) conduct any further proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.[41]

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 13, 2007.

*[signature]*
GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

---

[41] Because the ALJ on remand will be required to make a new RFC assessment taking into account the limitations, if any, from Plaintiff's IC, the Court does not need to address Plaintiff's argument that the ALJ erred by relying upon the Grids.